John Burton, State Bar No. 86029
jb@johnburtonlaw.com
THE LAW OFFICES OF JOHN BURTON
128 North Fair Oaks Avenue
Pasadena, California  91103
Tel: (626) 449-8300/Fax: (626) 440-8178

Attorneys for Plaintiff Shawn R. Porio

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWN R. PORIO,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF TUSTIN, ORANGE COUNTY FIRE AUTHORITY (OCFA), COUNTY OF ORANGE, TUSTIN POLICE DEPARTMENT OFFICERS IRINEO FLORES (#1392), E. URIAS (#1324), CHRISTOPHER PETERSON (#1359), HAYDEN NEWMAN (#1341), and MICHAEL WAGNER (#1313), OCFA FIREFIGHTERS BRENT PARDOEN (#6933), DAVID PHELAN (#6828), JOSEPH WINGERT, JR., (#6959) and TED HWANG (#7025), ORANGE COUNTY NURSES JENNIFER MAYA, RN, and YVETTE BARBARI, RN, and DOES 1-10,<br><br>    Defendants. | Case No. 8:22-cv-812<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. 42 U.S.C. § 1983 – Individual Defendants<br><br>2. 42 U.S.C. § 1983 – Entity Defendants<br><br>3. Title II of the ADA and the RA – Entity Defendants<br><br>4. Cal. Civil Code §§ 52 and 52.1<br><br>5. False Arrest – TPD and OCFA Defendants<br><br>6. Negligence and Gross Negligence<br><br>7. California Government Code § 845.6<br><br>**DEMAND FOR JURY TRIAL** |

## JURISDICTION AND VENUE

1.      Plaintiff asserts claims under 42 U.S.C. § 1983. Accordingly, subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

2.    Plaintiff's state-law claims form part of the same case and controversy, and are within the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367.

3.    Plaintiff's claims arise out of a course of conduct involving police officers of the City of Tustin, paramedics, EMTs and firefighters (collectively referred to as firefighters) of the Orange County Fire Authority, and staff at Orange County jail, in Orange County, California, all occurring within the Central District of California. Accordingly, venue is appropriate in this Court.

## PARTIES

4.    Plaintiff Shawn R. Porio is an adult qualified to bring suit.

5.    Defendant City of Tustin (City) is a California general law city, and includes the Tustin Police Department (TPD). Defendant Orange County Fire Authority (OCFA) is an independent public entity subject to suit. Defendant County of Orange (County) is a political subdivision of the State of California that operates pursuant to its charter. The County, through the Orange County Sheriff's Department (OCSD), manages the Orange County jail system and provides medical services for people in custody through the Orange County Health Care Agency (OCHCA). Collectively the City, OCFA and County are referred to as the "entity defendants," and includes their subsidiary agencies the TPD, OCSD and OCHCA.

6.    Defendants Irineo Flores (#1392), E. Urias (#1324), Christopher Peterson (#1359), Hayden Newman (#1341), and Michael Wagner (#1313) are employed by the City as TPD officers. Defendants Brent Pardoen (#6933), David Phelan (#6828), Joseph Wingert, Jr., (#6959) and Ted Hwang (#7025) are employed by OCFA as firefighters. Defendants Jennifer Maya, RN and Yvette Barbari, RN, are employed by the County and OCHCA, and are assigned to the jail to provide medical services. Collectively these eleven defendants are referred to as the "individual defendants."

7.    Does 1 through 10 are unnamed because their identities have yet to be ascertained. Plaintiff will seek to amend this complaint when they are identified.

1    8.    The individual and Doe defendants acted under color of state law and

2    within the scope of their agency and employment with the entity defendants.

3    **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

4    9.    On February 1, 2022, Plaintiff filed an administrative claim pursuant to

5    Cal. Gov't Code § 910 with each entity defendant. The OCFA denied the claim on

6    February 8, 2022. The County issued a notice of insufficiency on February 9, 2022.

7    Plaintiff filed an amended claim curing the insufficiency on February 15, 2022. Neither

8    the City nor County has acted Plaintiff's claim, although more than 45 days have

9    elapsed. Those claims are deemed denied pursuant to Cal. Gov't Code § 911.6(c).

10   Accordingly Plaintiff has exhausted his administrative remedies as to all three entity

11   defendants and this suit is timely.

12   **ALLEGATION OF FACTS COMMON TO ALL CLAIMS**

13   10.    Plaintiff Shawn R. Porio, then age 39, was driving alone in his own car in

14   compliance with all applicable laws westbound on Irvine Boulevard in the City of

15   Tustin, California, on October 16, 2021, around 6:00 a.m. He unexpectedly began

16   feeling unusual. Mr. Porio did not drink alcohol regularly, and had not consumed any

17   alcohol, drugs or medications. He believed he was healthy. His symptoms, which he had

18   never before experienced, were due to a vascular cerebral accident, a stroke. Mr. Porio

19   has subsequently been diagnosed with Moyamoya disease, a congenital condition that

20   causes strokes in relatively young people. Early diagnosis and treatment are essential.

21   11.    Mr. Porio pulled over. Because of the stroke symptoms there may have

22   been a minor collision with a parked car insufficient to cause an injury. Mr. Porio got

23   out of his car and collapsed in the number two westbound lane of Irvine Boulevard just

24   east of Prospect Avenue. TPD officers Irineo Flores (#1392), E. Urias (#1324),

25   Christopher Peterson (#1359), Hayden Newman (#1341), and Michael Wagner

26   (#1313), and OCFA firefighters Brent Pardoen (#6933), David Phelan (#6828),

27   Joseph Wingert, Jr., (#6959) and Ted Hwang (#7025) found Mr. Porio lying on his

28   back, supine, and in severe medical distress. An ambulance responded as well.

12.     According to Officer Flores' TPD report, Mr. Porio "was unable to stand on his own" and "had extreme difficulty speaking coherently," classic stroke symptoms. Mr. Porio did not smell of alcohol and there were no alcohol containers in his car. Nevertheless, the officers and firefighters assumed without any basis that Mr. Porio was inebriated. Failing to perform an appropriate medical evaluation, the OCFA firefighters said Plaintiff was drunk and turned him over to the TPD officers. The first responders acted in substantial part on the basis of backward stereotypes about Hispanic and Asian men, spiced with anti-immigrant bias. (Mr. Porio is of Filipino decent.)

13.     Once they took custody of Mr. Porio the first responders, both the officers and firefighters, were required under the Fourth Amendment to act with objective reasonableness and provide necessary medical evaluation and treatment, which under these circumstances required an immediate "code 3" transport to an emergency room, where qualified medical providers, including emergency medicine physicians, with appropriate medical equipment such as CT scanners, could make an accurate diagnosis. As explained below, the baseless decision to arrest Mr. Porio for drunk driving instead of taking him to the hospital has had catastrophic consequences that will continue to afflict Mr. Porio through the remainder of his life.

14.     Despite the lack of probable cause to believe that Mr. Porio was incapacitated by alcohol, the named TPD officer and Does arrested Mr. Porio for driving under the influence of alcohol. To show that Mr. Porio had in fact been driving, Officer Flores' report falsely stated: "The vehicle's keys were in the ignition in the on position." That model car is keyless. Officer Flores' report also states, in direct conflict with the firefighters' records, that Mr. Porio had been "medically cleared."

15.     The OCFA firefighters charted in their records that Mr. Porio had a perfect Glascow coma score (GCS) of 15, which cannot be true if he was "unable to stand" and had "extreme difficulty speaking coherently." Either the TPD officer, the OCFA firefighters, or both, wrote false reports. Moreover, the OCFA reported no abnormal findings, yet it states that Mr. Porio "needed immediate medical attention."

16.    There is nothing in the OCFA report to indicate why Mr. Porio might need medical attention. Finally, the OCFA records states that Mr. Porio "knowingly refuse[d] treatment and/or transport to the nearest recommended medical facility by, and against the advice of, Emergency Medical Services (EMS) personnel," adding that Mr. Porio "fully underst[ood] the nature and seriousness of [his] illness/injury, and the risks to [his] life and health by refusing the recommended treatment/transport." These statements are obvious fabrications. No person in Mr. Porio's position, experiencing a serious medical emergency of unknown origin, would choose to be taken to jail for drunk driving, especially when he had not been drinking, rather than being taken to a hospital to find out what was causing his symptoms. Moreover, the firefighters' report flatly contradicts the statement in the TPD report that the firefighters "medically cleared" Mr. Porio to be arrested and booked. Again, either TPD Officer Flores, the OCFA firefighters, or all of them, are lying.

17.    Although there was an ambulance on scene, Officer Flores transported Mr. Porio to the TPD Station in his car, where phlebotomist Nandlal Dudhat drew blood. (The toxicology results, which became available on a later date, showed no alcohol or drugs.) Had Officer Flores taken Mr. Porio to an emergency room for the blood draw, his stroke would have been diagnosed, and its residual effects minimized. Officer Flores then took Mr. Porio to the Orange County Jail, where he was to be booked for allegedly violating Cal. Veh. Code § 23152(a), driving under the influence.

18.    OCHCA Nurse Jennifer Maya, RN, screened Mr. Porio for COVID-19 and other conditions around 10:00 a.m. on October 16 in the Orange County Jail Inmate Reception Center. OCHCA Nurse Yvette Barbari, RN, conducted the receiving screening. Nurse Barbari input lies into the jail medical chart. For example, she wrote Mr. Porio answered "Yes" to the question "Are you using alcohol?" and "<12 hours" to the question "When was your last drink?" Those answers are demonstrably false, as Mr. Porio had not been drinking, as corroborated by his negative blood toxicology results. She answered "3 to 5" to "How many drinks do you have each time you drink?"

1  This answer was fabricated. On the rare occasions when Mr. Porio did consume

2  alcohol, it was usually a single beer at a social event.

3       19.    Nurse Barbari answered "No," to "Does the inmate appear to be

4  unsteady, confused, lethargic, and/or stuporous or has slurred speech or tremors?" an

5  observation directly contradicted by her comment that he was "answering few

6  questions due to ETOH [alcohol] intox[ication]." Mr. Porio was obviously continuing

7  to display significant symptoms of the stroke that began a few hours before.

8       20.    Mr. Porio has only fragmentary recollection of the roughly 22 hours he

9  spent in County custody, and the records the County produced pursuant to his

10  California Public Records Act request are incomplete. Mr. Porio is informed and

11  believes that despite obvious signs of increasingly severe medical distress produced by

12  his ongoing vascular cerebral accident he was put into a sobering cell, or some other

13  inappropriate holding cell, with both custody and medical jail staff deliberately

14  indifferent to his worsening mental and physical condition. He was too ill to make a

15  phone call, and the jailors and jail medical staff made no effort to reach his family, to

16  have him evaluated by a qualified medical provider or to call paramedics.

17       21.    Relatives of Mr. Porio in Northern California eventually learned from a

18  bail bonding agency that the TPD had arrested Mr. Porio for driving under the

19  influence, which made no sense to them because he is known within the extended

20  family as a virtual teetotaler. Those relatives were able to alert Southern California

21  family members, who were already trying to locate their missing loved one. The local

22  family members' inquiries were not timely and accurately answered by either the TPD

23  or the County Jail. Meanwhile, Mr. Porio's condition continued to deteriorate, as the

24  undiagnosed and untreated vascular cerebral accident continued to progress, affecting

25  more and more of his brain, causing more and more irreversible damage.

26       22.    On the morning of October 17, after spending a night in jail with no

27  medical attention, Mr. Porio was brought by wheelchair back to the Inmate Reception

28  Center "for eval[uation] and OR [release on his own recognizance] clearance." Instead

of showing alarm at his medical condition, the Orange County Jail staff, with no evidence, assumed Mr. Porio was under the influence of fentanyl or some other illicit drug he obtained while in custody. OCHCA Nurse Daniel Bergmann, RN, charted: "When arrived, patient was altered with minimal respose [*sic*] to verbal, painful, or amonia [*sic*] inhalant stimuli." Nurse Bregmann administered two doses of Narcan, treatment for an opiate overdose, a needless but harmless measure that had no effect. At Nurse Bergmann's direction, custody staff called OCFA at 7:45 a.m.

23.    A different crew of firefighters responded to the Inmate Reception Center. They reported that Mr. Porio was being "uncooperative" and listed as their primary impression: "drug overdose." Fortunately they transported Mr. Porio to the Providence Saint Joseph's Hospital Emergency room, where he arrived shortly after 8:00 a.m., more than 26 hours after the TPD and OCFA first found him lying on his back on Irvine Boulevard.

24.    Within 45 minutes of his arrival in the emergency room, Mr. Porio had a brain CT scan with contrast that confirmed his stroke. Neurological examination determined his NIH Stroke Scale score to be 10, indicating significant impairment with potential for only partial recovery. Had Defendants brought him to the emergency room 26 hours sooner, when he was first taken into TPD and OCFA custody on Irvine Boulevard, his NIH Stroke Scale would have be less than 5, indicative of a stroke patient with a prognosis of a complete and rapid recovery.

**DAMAGES**

25.    Mr. Porio suffered extensive, severe and permanent damage to his brain and its vascular system as a direct and proximate result of Defendants' false arrest and wrongful 26-hour delay in seeking medical treatment. Tragically, because of the delay, effective t-PA therapy could not be initiated, and other opportunities lost. Had t-PA been commenced within four hours of the onset of symptoms the ensuing treatment would have been far less extensive, and the extent and degree of the damage would have been minimized, leaving Mr. Porio with minimal, if any, residual deficits.

26.     Instead, as a proximate result of Defendants' wrongful acts and omissions, Mr. Porio sustained significant irreversible brain injury, which necessitated admission to the St. Joseph Intensive Care Unit (ICU), where Mr. Porio spent five days, before being transferred to St. Joseph intermediate care for another six days. On October 28, Mr. Porio was transferred to Long Beach Memorial Hospital, where he spent the next six weeks in intensive in-patient rehabilitation. He was discharged to home in December, where he continued with intense therapy. In early January, he underwent follow-up brain surgery. Mr. Porio is presently home and working on his rehabilitation.

27.     While Defendants did not cause the stroke—it was caused by Moyamoya disease—the consequences were substantially exacerbated by the 26-hour delay in diagnosis and treatment, including but not limited to the lost opportunity to use t-PA therapy. The mechanisms and full extent of the additional brain injury and its sequelae, and the resulting additional medical expenses and lost income, will be proven at trial.

28.     As a direct and proximate result of the acts, omissions, customs, practices, policies and decisions of Defendants, Mr. Porio was injured in his health and person. He has suffered and will continue to suffer cognitive and physical deficits, including partial paralysis, along with great mental and physical pain, suffering, anguish, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Plaintiff and will in the future continue to cause Plaintiff general damages in amounts to be determined at trial.

29.     As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the aforementioned defendants, Plaintiff incurred medical expenses, and will incur future medical expenses, in amounts to be determined at trial.

30.     As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the aforementioned defendants, Plaintiff incurred costs of assistance and care, and will incur future costs of assistance and care, in amounts to be determined at trial.

31.     As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the aforementioned defendants, Plaintiff incurred loss of income, and will incur future losses of income, in amounts to be determined at trial.

32.     The aforementioned acts of the individual defendants, and each of them, were willful, wanton, malicious and oppressive, with reckless disregard for, with deliberate indifference to, and with the intent to deprive Plaintiff of his federal and state constitutional and statutory rights and privileges, and did in fact violate the aforementioned rights and privileges, entitling Plaintiff to exemplary and punitive damages under federal and state law in amounts to be proven at trial.

**FIRST CLAIM FOR RELIEF**

(42 U.S.C. § 1983 – Individual Defendants )

33.     Plaintiff incorporates by reference each and every allegation contain in the foregoing paragraphs.

34.     The individual and Doe defendants, while acting under color of state law, deprived Plaintiff of rights secured by the Constitution and laws of the United States, including but not limited to those guaranteed by the Fourth and Fourteenth Amendments and each of the following:

> (a)     The individual defendants who found Plaintiff on Irvine Boulevard, TPD officers Flores, Urias, Peterson, Newman, and Wagner, and OCFA firefighters Pardoen, Phelan,  Wingert, and Hwang, and Does, by their affirmative conduct took custody of Plaintiff, thus establishing a duty and special relationship. They thereafter placed Plaintiff in peril and failed to render necessary medical treatment or to transport Plaintiff for appropriate medical treatment in deliberate indifference to his safety and serious medical needs, thus depriving Plaintiff of clearly established Fourth- and Fourteenth-Amendment rights.

(b)     TPD officers Flores, Urias, Peterson, Newman, and Wagner, OCFA firefighters Pardoen, Phelan,  Wingert, and Hwang, and Does, arrested Plaintiff without probable cause, depriving Plaintiff of clearly established Fourth-Amendment rights.

(c)     TPD officer Flores and others, including Does, at the TPD station were deliberately indifferent to Plaintiff's serious medical needs, depriving Plaintiff of clearly established Fourth- and Fourteenth-Amendment rights as an arrestee and a pretrial detainee.

(d)     TPD officers Flores, Urias, Peterson, Newman, and Wagner, and OCFA firefighters Pardoen, Phelan, Wingert, and Hwang, OCHCA Nurse Barberi, and Does, fabricated false reports and conspired to fabricate false reports regarding Plaintiff consuming alcohol, being healthy enough to book, refusing medical treatment and transportation, and admitting to drinking while being screened in jail, thus violating Plaintiff's right to due process by fabricating evidence, and depriving Plaintiff of clearly established Fourth- and Fourteenth-Amendment rights.

(e)     OCHCA nurses Maya and Barbari, and Does, were objectively deliberately indifferent to Plaintiff's serious medical needs by failing to summon paramedics to transport Plaintiff, a pretrial detainee, to the hospital, instead preparing false chart entries to justify the false arrest and putting Plaintiff in a cell rather than referring him to a medical provider, depriving Plaintiff of clearly established Fourteenth Amendment rights.

The foregoing list of constitutional violations is intended to be illustrative and not exhaustive, and is based on the minimal amount of information the entity defendants have turned over to date pursuant to Plaintiff's public records act requests. Plaintiff anticipates that additional information obtained in discovery will establish additional constitutional violations and additional grounds to support those constitutional violations alleged in this paragraph.

35.     The above mentioned individually named and Doe defendants acted under color of law, and both separately and in concert. Each had the opportunity to intervene to prevent constitutional violations by others, and each chose not to do so.

36.     As a direct and proximate result of the aforesaid acts and omissions of the individual and Doe defendants, Plaintiff was injured in his health and person, and sustained general and special damages.

37.     The aforementioned acts of the individual defendants, and each of them, were willful, wanton, malicious and oppressive, with reckless disregard or with deliberate indifference and with the intent to deprive Plaintiff of his constitutional rights and privileges, and did in fact deprive Plaintiff of the aforementioned rights and privileges, entitling Plaintiff to exemplary and punitive damages in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**

(42 U.S.C. § 1983 – Entity Defendants)

38.     Plaintiff incorporates by reference each and every allegation contain in the foregoing paragraphs.

39.     Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, the entity defendants and their relevant policy makers acted with deliberate indifference, and in conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff, and others similarly situated, including the right to prompt and adequate medical screening and attention, accurate reports and medical charts, and freedom from arrests not supported by probable cause.

40.     The entity defendants and their relevant policy makers maintained, enforced, tolerated, ratified, permitted, acquiesced in, and applied, among others, the following policies, practices and customs: failing to train officers and firefighters to handle usual and recurring situations with which they must deal, including encountering people who are incapacitated by strokes or other pathologies such as seizures and the post-ictal state, diabetic imbalances, and other disabilities, and training them to rule out

such medical emergencies, and not to assume that incapacitated people, especially men of Latino or Asian decent, are under the influence of alcohol or drugs.

41.     Plaintiff alleges that other policies, practices and customs as may be established through discovery, are also the moving force or proximate cause of Plaintiff's constitutional deprivations, including but not limited to, express authorization, ratification, failure to train and failure to supervise, to investigate, and to discipline misconduct.

42.     As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the aforementioned entity defendants, Plaintiff was injured in his health and person, and will continue to suffer great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, disfigurement and apprehension, which have caused Plaintiff to sustain past and future compensatory damages.

### THIRD CLAIM FOR RELIEF

(ADA and Rehabilitation Act – Against the Entity Defendants)

43.     Plaintiff re-alleges and incorporates by reference all previous paragraphs as though fully set forth herein.

44.     Congress enacted the Americans with Disabilities Act ("ADA") on a finding that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

45.     The entity defendants receive federal assistance and funds, and are therefore subject to the Rehabilitation Act, 29 U.S.C. § 794 (RA). The entity defendants are within the mandate of the RA that no person with a disability may be excluded from

1   participation in, be denied benefits of, or be subjected to discrimination under any

2   program or activity."  29 U.S.C. § 794.

3        46.   Title II of the ADA provides in pertinent part: "[N]o qualified individual

4   with a disability shall, by reason of such disability, be excluded from participation in or

5   be denied the benefits of the services, programs, or activities of a public entity, or be

6   subjected to discrimination by any such entity." 42 U.S.C. § 12132.

7        47.   When contacted by and in Defendants' custody, Mr. Porio was a

8   "qualified individual" with an illness, disability and medical impairment that limited his

9   ability to care for himself and control his physical health condition as defined under the

10  ADA, 42 U.S.C. § 12131(2), and Section 504 of the RA. 29 U.S.C. § 794; 28 C.F.R.

11  42.540(k). Mr. Porio's disability—his inability to stand or to speak coherently—was

12  charted by both Officer Flores and Nurse Barbari—and was obvious.

13       48.   The entity defendants are public entity subject to Title II of the ADA. 42

14  U.S.C.§ 12131(1)(A). Title II of the ADA and the RA apply generally to policing,

15  emergency medical services and jail services, programs, or activities. 42 U.S.C. § 12132.

16       49.   The entity defendants are mandated to develop an effective, integrated,

17  comprehensive system for the delivery of all services to persons with disabilities, and to

18  ensure that the personal and civil rights of persons who are receiving services under

19  their aegis are protected. In regards to person in the position of Mr. Porio they failed to

20  do so by allowing first responders and jail staff to treat people who are incapacitated by

21  a medical emergency as if they were voluntarily intoxicated.

22       50.   Respondeat superior liability applies to Title II claims. The entity

23  defendants are therefore liable under Title II of the ADA and Section 504 of the RA for

24  the unlawful acts of its employees.

25       51.    Plaintiff was arrested because the TPD officers and OCFA firefighters

26  misperceived the effects of his disability as criminal activity, in violation of the ADA

27  and RA.

28

52.     Defendants thereafter failed to make reasonable accommodation for Plaintiff's disability in the course of investigation, arrest, and incarceration, thereafter causing Plaintiff to suffer greater injury and indignity than other arrestees. In particular Defendants failed to reasonably accommodate Plaintiff's disability in the course of arresting him, jailing him and denying him medical care, causing him to suffer greater injury in the process than other detainees or arrestees, including causing permanent irreversible brain damage. Defendants' failures to accommodate Plaintiff's disability include but are not limited to:

(a)     causing the violation of Mr. Porio's rights through all customs, policies, and practices identified above;

(b)     failing to use lawful and appropriate policies, practices, and procedures for arrestees and detainees who exhibit signs of mentally impairment that might be the result of a pathology such as a stroke rather than inebriation;

(c)     failing to provide Plaintiff with timely, competent and appropriate medical care;

(d)     failing to institute proper medical precautions;

(e)     failing to develop an effective, integrated, comprehensive system for the delivery of services to persons with disabilities, and to ensure that the personal and civil rights of persons who are receiving services under its aegis are protected;

(f)     other failures to provide accommodations as the evidence in this case may show.

53.     As a direct and proximate result of Defendants' conduct, and their deliberate indifference to Mr. Porio's medical and mental condition, he experienced physical pain, severe emotional distress, and mental anguish during his incarceration at the Jail, as well as irreversible brain damage and the other damages alleged herein.

1

## FOURTH CLAIM FOR RELIEF

2

(Cal. Civ. Code §§ 52 and 52.1 – Against All Defendants)

3      54.    Plaintiff re-alleges and incorporates by reference all previous paragraphs as

4    though fully set forth herein.

5      55.    All defendants are subject to liability under California Civil Code §§ 52 and

6    52.1 because the individual and Doe defendants interfered with Plaintiffs' federal and

7    state constitutional and statutory rights by way of threats, intimidation or coercion. In

8    addition to the federal constitutional deprivations alleged above, the individual

9    defendants violated Plaintiffs' right to be free from arrest without probable cause as

10   guaranteed by Article I, § 13 of the California Constitution, bodily integrity as

11   guaranteed by California Civil Code § 43, and emergency medical assistance as a jail

12   prisoner guaranteed by Cal. Gov't Code § 845.6 and by various provisions of Title 15 of

13   the California Code of Regulations.

14     56.    The entity defendants are vicariously liable for the actions of their agents

15   and employees pursuant to Cal. Gov. Code § 815.2 and § 815.4.

16     57.    As a direct and proximate result of the acts and omissions of defendants,

17   Plaintiff was injured in his health and person, and will continue to suffer great mental

18   and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation,

19   indignity, embarrassment, disfigurement and apprehension, as alleged above, along with

20   statutory damages as provided by law.

21     58.    The above mentioned individually named and Doe defendants, acted

22   under color of law, and both separately and in concert. The aforementioned acts of

23   those defendants, and each of them, were willful, wanton, malicious and oppressive,

24   with reckless disregard or with deliberate indifference and with the intent to deprive

25   Plaintiff of his federal and state constitutional rights and privileges, and did in fact

26   violate the aforementioned rights and privileges, entitling Plaintiff to exemplary and

27   punitive damages in an amount to be proven at trial.

28

**FIFTH CLAIM FOR RELIEF**

(False Imprisonment – against TPD, OCFA and officers and firefighters)

59.     Plaintiff re-alleges and incorporates by reference all previous paragraphs as though fully set forth herein.

60.     TPD officers Flores, Urias, Peterson, Newman and Wagner, and OCFA firefighters Pardoen, Phelan, Wingert and Hwang, and Does, evaluated Plaintiff while he was on Irvine Boulevard incapacitated by the vascular cerebral accident that had just occurred. Without probable cause, or any evidence whatsover, and motivated by invidious animus, these defendants unreasonably fabricated records in support of a conclusion that Plaintiff's inability to speak coherently or stand up was related to alcohol intoxication despite the lack of alcohol aroma or containers.

61.     The officers acted in concert with the firefighters, all of whom unreasonably reinforced each other's false conclusions and prepared or acquiesced in false reports that Plaintiff was driving while impaired by alcohol, including that he was displaying signs of alcohol intoxication and that his keys were in the ignition in the "on" position. The firefighters examined Plaintiff, ruled out injuries due to the minor motor vehicle collision that may have occurred when he pulled over because of the stroke symptoms, and the charted that Plaintiff was ETOH.

62.     As a result of the false arrest for driving under the influence, Plaintiff was taken in a police car to the TPD station, and the ambulance that had responded to the scene to transport Plaintiff to the emergency room, where the stroke would have been detected, was sent away unused.

63.     The entity defendants are vicariously liable for the actions of their agents and employees pursuant to Cal. Gov. Code § 815.2 and § 815.4.

64.     As a direct and proximate result of the aforesaid acts and omissions of the individual and Doe defendants, Plaintiff was injured in his health and person, and sustained general and special damages.

65.    The aforementioned acts of the individual defendants, and each of them, were willful, wanton, malicious and oppressive, with reckless disregard or with deliberate indifference and with the intent to deprive Plaintiff of his constitutional rights and privileges, and did in fact deprive Plaintiff of the aforementioned rights and privileges, entitling Plaintiff to exemplary and punitive damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

(Negligence and Gross Negligence – Against All Defendants)

66.    Plaintiff incorporates by reference each and every allegation contain in the foregoing paragraphs.

67.    The individual defendants owed Mr. Porio a duty of care to provide him immediate medical and mental health care. They knew or should have known that Mr. Porio might be in need of immediate medical care, and they failed to take reasonable action to provide or summon that care.

68.    The OCFA firefighters were deliberately indifferent, reckless, grossly negligent and negligent in their failure to properly evaluate, treat and transport Plaintiff via the ambulance on scene. The TPD police officers and County jail staff, including the custody staff and the OCHCA staff, were deliberately indifferent, reckless, grossly negligent and negligent in their assessment and treatment of Plaintiff.

69.    The County violated mandatory duties imposed by California state law, including Cal. Govt. Code §§ 844.6 and 845.6, and provisions of Cal. Code of Regulations, Title 15 regarding medical staffing of jails and the use of sobering cells.

70.    The entity defendants are vicariously liable for the actions of their agents and employees pursuant to Cal. Gov. Code § 815.2 and § 815.4.

71.    As a direct and proximate result of Defendants' negligence, gross negligence and deliberate indifference, Plaintiff suffered past and future injuries and damages as alleged herein.

## SEVENTH CLAIM FOR RELIEF

### (California Government Code § 845.6 – Against County and Does)

72.     Plaintiff re-alleges and incorporates by reference all previous paragraphs as though fully set forth herein.

73.     The County, through its agents and employees at the jail, and those agents and employees, had a mandatory duty imposed by Cal. Gov't Code § 845.6, to summon emergency medical assistance for Plaintiff and failed to do so, causing past and future damages as alleged.

## PRAYER

WHEREFORE, Plaintiff requests relief as follows, and according to proof, against each defendant:

1.    Past and future general damages according to proof;

2.    Special damages according to proof;

3.    Exemplary and punitive damages against each individual and Doe defendant under the First, Third and Fifth Claims for Relief, but not against the entity defendants, according to proof;

4.    Costs of suit, including attorneys' fees, under 42 U.S.C. § 1988 and provisions of California law; and

5.    Such other relief as may be warranted or as is just and proper.

Dated:    April 13, 2022          THE LAW OFFICES OF JOHN BURTON

By:    /S/ John Burton
       _____
       John Burton
       Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury.

Dated:    April 13, 2022          THE LAW OFFICES OF JOHN BURTON

By:    /S/ John Burton
       _____
       John Burton
       Attorneys for Plaintiff