# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

R. GARY KLAUSNER, JR., U.S. DISTRICT JUDGE

SHAWN PORIO,                    )
                                )
          Plaintiff,            )
                                )
     vs.                        )
                                )   8:22-CV-812-RGK
YVETTE BARBARI,                 )
                                )
          Defendant.            )
_____ )
                                )
                                )
                                )

REPORTER'S TRANSCRIPT OF JURY TRIAL

VOLUME I

Los Angeles, California

Tuesday, December 10, 2024

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

1    APPEARANCES OF COUNSEL:

2

     For the Plaintiff:
3

4                        THE LAW OFFICES OF JOHN BARTON
                         By:  John Barton, Attorney at Law
5                        128 North Fair Oaks Avenue
                         Pasadena, California 91103
6

7                        LAW OFFICE OF JOHN FATTAHI
                         By:  John Fattahi, Attorney at Law
8                        21250 Hawthorne Boulevard, Suite 500
                         Torrance, California 90503
9

10

     For the Defendant:
11

                         LYNBERG & WATKINS APC
12                       By:  S. Frank Harrell, Attorney at Law
                              G. Craig Smith, Attorney at Law
13                       1100 West Town and Country Road, Suite 1450
                         Orange, California 92868
14

15

16

17

18

19

20

21

22

23

24

25

1  14:25:35          THE WITNESS:  Thank you.

2  14:25:38          THE COURT:  Next witness.

3  14:25:52          MR. BURTON:  Thank you, Your Honor.

4  14:25:56          Could I inquire as to whether the plaintiff's next

5  14:26:01  witness is the defendant, Yvette Barbari?  If I can inquire

6  14:26:05  as to whether her original deposition has been lodged.  We

7  14:26:09  have a certified copy if it's needed.

8  14:26:24          THE CLERK:  I do not have it.

9  14:26:27          MR. BURTON:  May I approach, Your Honor?

10 14:26:28          THE COURT:  Please.

11 14:26:50          THE CLERK:  Please go around.

12 14:26:52          THE WITNESS:  May I take my water up there?

13 14:26:55          THE COURT:  Sure.

14 14:27:05          THE CLERK:  Raise your right hand.

15 14:27:09  THEREUPON:

16 14:27:09                        YVETTE BARBARI,

17 14:27:09  called in these proceedings and being first duly sworn

18 14:27:09  testifies as follows:

19 14:27:17          THE CLERK:  Please be seated.

20 14:27:19          Adjust the microphone so you are speaking into it at

21 14:27:31  all times.

22 14:27:32          For the record, state your full name and spell your

23 14:27:36  last name.

24 14:27:36          THE WITNESS:  My name is Yvette Barbari,

25 14:27:39  B-A-R-B-A-R-I.

1 14:51:52    correct?

2 14:51:53     A. I do not recall, correct.

3 14:51:56     Q. And you have no recollection of discussing with Officer

4 14:52:03    Flores why he thought Mr. -- Mr. Porio might fit the criteria

5 14:52:16    for this answer number 3, correct?

6 14:52:19     A. Correct.

7 14:52:20     Q. And so you had to do an independent assessment, correct?

8 14:52:24     A. Yes.

9 14:52:25     Q. Now, there are two parts to your assessment, correct?

10 14:52:34    The first is what you might call the screening form, and --

11 14:52:42    the receiving screening, and the second is the comprehensive

12 14:52:46    detox screen, correct?

13 14:52:47     A. Yes.

14 14:52:47     Q. And so as a matter of -- of procedure, you do the

15 14:52:54    receiving screening first, correct?

16 14:52:56     A. Yes.

17 14:52:57         MR. BURTON:  Okay.  And I would like to move

18 14:53:01    Exhibit 83A, pages 1 through 18, which -- into evidence.

19 14:53:10         THE COURT:  It will be received.

20 14:53:12         MR. HARRELL:  Please.

21 14:53:13         THE COURT:  I'm sorry, you want a few minutes on

22 14:53:16    that, Counsel?

23 14:53:16         MR. HARRELL:  Yes, Your Honor, we are checking.

24 14:53:19         THE COURT:  Okay.  I'll hold my ruling on it.

25 14:53:28         MR. HARRELL:  1 through 18?

1 14:59:15    answering a few questions, correct?

2 14:59:17     A. Possibly.  I don't have it right in front of me.

3 14:59:26     Q. Okay.  Well, I'll put it right in front of you.

4 14:59:28          This is page 18, and there is a section there for

5 14:59:35    your comment, correct?

6 14:59:37     A. Yes.

7 14:59:37     Q. And you wrote, "patient," that is what the PT stands for?

8 14:59:44     A. Correct.

9 14:59:45     Q. "Patient answering few questions due to ETOH intox."  Do

10 14:59:52    you see that?

11 14:59:52     A. Yes.

12 14:59:53     Q. And "ETOH intox" is a reference to being under the

13 14:59:57    influence of alcohol?

14 14:59:58     A. Yes.

15 14:59:59     Q. And so did you think he was under the influence of

16 15:00:04    alcohol because you saw that on the booking paperwork?

17 15:00:07     A. I also asked him questions about it.

18 15:00:15          MR. BURTON:  Could I read from the deposition, Your

19 15:00:17    Honor, page 82, lines 2 to 5?

20 15:00:26          THE COURT:  Just a second.

21 15:00:34          MR. HARRELL:  No objection.

22 15:00:36          THE COURT:  It may be read, Counsel.

23 15:00:38     Q.    "QUESTION:  So if he was answering few questions,

24 15:00:41    why did you think it was due to ETOH intoxication?

25 15:00:47          ANSWER:  It could be because I saw it on the booking

1 15:00:50  paperwork."

2 15:00:57          Now, you also, besides getting answers to

3 15:01:10  questions -- and you are saying he answered one way or

4 15:01:14  another all of these questions that you put down in the form

5 15:01:17  during this 12 minutes?

6 15:01:18  A. Yes.

7 15:01:20  Q. Either by nodding or verbally?

8 15:01:23  A. Yes.

9 15:01:25  Q. Even though you -- you wrote down he was answering few

10 15:01:28  questions?

11 15:01:30  A. Yes.

12 15:01:32  Q. Okay.  And then there is a section in here for your own

13 15:01:39  observations, correct?  It's called observation, it's on page

14 15:01:45  15.

15 15:01:46  A. Okay.  Yes.

16 15:01:48  Q. Okay.  And the first one you said is, "Does the inmate

17 15:01:54  appear to have barriers to communication?"  And you said

18 15:01:57  "No," correct?

19 15:01:57  A. Correct.

20 15:01:58  Q. Even though he was answering few questions due to ETOH

21 15:02:04  intoxication?

22 15:02:06  A. Yes.

23 15:02:08  Q. Okay.  And then let's go to page 17.

24 15:02:14          Now, you wrote at the top of page 17, "Does the

25 15:02:24  inmate appear to be unsteady, confused, lethargic and/or

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 15:30:21 officer supposed to do with the COVID questions if the

2 15:30:24 arrestee does not answer?

3 15:30:25  A. Just leave it blank.

4 15:30:27  Q. Here, how many of the 11 questions that you were looking

5 15:30:30 at on the date of the incident are left blank?

6 15:30:32  A. None of them.

7 15:30:33  Q. So what, if anything, did that tell you on the date of

8 15:30:37 the incident about Mr. Porio's level of alertness with the

9 15:30:41 officer about three minutes before you saw him?

10 15:30:44  A. He was alert and communicating with Officer Flores.

11 15:30:47  Q. All right.  So let's look at another form.  Let's talk

12 15:30:54 with Mr. Porio's conversations with you.

13 15:31:01       Let's look at the page from the receiving screening

14 15:31:04 form, this is Exhibit 83A-11.

15 15:31:12       Who filled this form out?

16 15:31:13  A. I did.

17 15:31:14  Q. All right.  And which arrestee were you assessing?

18 15:31:18  A. Mr. Porio.

19 15:31:19  Q. Is his name anywhere on this form?

20 15:31:22  A. Yeah, down below, bottom left.

21 15:31:24  Q. Okay.  Did Mr. Porio give you any information about

22 15:31:31 wearing glasses when you assessed him?

23 15:31:33  A. Yes.

24 15:31:34  Q. So what did you record?

25 15:31:36  A. I checked the box that yes, he does wear glasses, and

1  15:31:39  that he was not wearing them at this time during this time.

2  15:31:42  Q. All right.  Let's play Exhibit 109, clip number 1, and

3  15:31:46  tell me if you see Mr. Porio wearing glasses.

4  15:31:49            (Thereupon, the video was played.)

5  15:31:59  Q. When he was with you, ma'am, was Mr. Porio wearing

6  15:32:02  glasses?

7  15:32:02  A. No.

8  15:32:07  Q. Let's go back to our receiving screening form,

9  15:32:12  Exhibit 83A-11.  Now, did you ask this question of Mr. Porio

10  15:32:21  when you were with him on that day about whether or not he

11  15:32:24  needed glasses?

12  15:32:25  A. Yes.

13  15:32:26  Q. What did he tell you?

14  15:32:27  A. Yes.

15  15:32:29  Q. Now, did you make any other notes there?

16  15:32:32  A. I wrote in there that -- excuse me.  I wrote that he was

17  15:32:35  not wearing them, so he's currently not wearing glasses.

18  15:32:39  Q. Was there any way that you could have known anything

19  15:32:48  about Mr. Porio wearing glasses if he didn't tell you that?

20  15:32:51  A. No.

21  15:32:54  Q. Let's look at the nurse's receiving screening form

22  15:33:00  Exhibit 83A-7.  This, again, is your form, ma'am, right?

23  15:33:05  A. Yes.

24  15:33:05  Q. These are questions that you asked of Mr. Porio, right?

25  15:33:09  A. Yes.

1  15:33:09   Q. And you recorded his answers, correct?

2  15:33:12   A. Correct.

3  15:33:13   Q. All right.  Now, some of these questions ask very

4  15:33:23   sensitive information, right?

5  15:33:24   A. Yes.

6  15:33:25   Q. Including whether or not Mr. Porio is sexually active,

7  15:33:29   right?

8  15:33:29   A. Correct.

9  15:33:29   Q. Did you come up with this form, ma'am?

10 15:33:32   A. No.

11 15:33:32   Q. All right.  Did you ask Mr. Porio if he was sexually

12 15:33:37   active?

13 15:33:37   A. Yes.

14 15:33:38   Q. What did he communicate to you?

15 15:33:39   A. He said no.

16 15:33:42   Q. So what did you record?

17 15:33:44   A. No.

18 15:33:46   Q. Is there any way that you could have known anything about

19 15:33:49   Mr. Porio's sex life if he didn't tell you about it?

20 15:33:52   A. No.

21 15:33:53   Q. And I think earlier you mentioned that one of the things

22 15:33:57   that you look at when you are trying to sort out stroke

23 15:34:01   versus intoxication is risk factors, right?

24 15:34:04   A. Correct.

25 15:34:04   Q. Let's talk about that a little bit.

1  15:37:23          MR. HARRELL:  83A.

2  15:37:24          THE COURT:  83A.

3  15:37:27          MR. HARRELL:  83-6.

4  15:37:30          THE COURT:  Okay.  83-6.  Do you have it, Counsel?

5  15:37:35          MR. BURTON:  Yes.

6  15:37:36          THE COURT:  Okay.

7  15:37:36          MR. BURTON:  Thank you, Your Honor.

8  15:37:37          MR. HARRELL:  Okay.

9  15:37:37  BY MR. HARRELL:

10 15:37:44    Q. All right.  Ma'am, is -- who entered this information on

11 15:37:51  October 16th at 10:02 in the morning?

12 15:37:56    A. I did.

13 15:37:56    Q. All right.  What was Mr. Porio's blood pressure reading?

14 15:38:01    A. 118 over 78.

15 15:38:03    Q. All right.  Is that high blood pressure based on your

16 15:38:06  training and experience?

17 15:38:07    A. No, it's perfect.

18 15:38:08    Q. All right.  So based on your training and experience, and

19 15:38:18  assuming this blood pressure reading is accurate, did

20 15:38:20  Mr. Porio have high blood pressure at the time that you saw

21 15:38:23  him?

22 15:38:23    A. No.

23 15:38:24    Q. When you were assessing him, did you have any concerns

24 15:38:27  that Mr. Porio's blood pressure put him in a risk group for

25 15:38:30  stroke?

1  15:38:31   A. No.

2  15:38:32   Q. Let's talk about head trauma.

3  15:38:36        Based on your training and experience at the time

4  15:38:38   you saw Mr. Porio, can head trauma be a risk factor for

5  15:38:42   stroke?

6  15:38:42   A. Yes.

7  15:38:43   Q. Did you have a good view of Mr. Porio's head when you

8  15:38:46   were assessing him?

9  15:38:46   A. Yes.

10 15:38:47   Q. Does the triage tape, Exhibit 109, does it accurately

11 15:38:52   capture how Mr. Porio's head looked when you saw him?

12 15:38:55   A. Yes.

13 15:38:55   Q. Let's play 109, clip 1.

14 15:39:00        (Thereupon, the video was played.)

15 15:39:04   Q. Let me know if you see any signs of head trauma with

16 15:39:08   Mr. Porio.  Any head trauma there, ma'am?

17 15:39:27   A. No.

18 15:39:27   Q. All right.  Now, let's go back to your medical forms,

19 15:39:31   83A-11.

20 15:39:33        You see the question at the bottom asking, "Have you

21 15:39:37   ever had a head injury that affected your activities of daily

22 15:39:41   living?"  Did you ask Mr. Porio about that?

23 15:39:44   A. Yes.

24 15:39:44   Q. What was his answer?

25 15:39:46   A. No.

1 15:39:48   Q. So on the date of the incident, did you have any concerns

2 15:40:03   that Mr. Porio was in a risk group for stroke because of head

3 15:40:09   trauma?

4 15:40:09   A. No.

5 15:40:09   Q. Based on your training and experience, at the time you

6 15:40:14   saw Mr. Porio, can diabetes be a risk factor for stroke?

7 15:40:18   A. Yes.

8 15:40:18   Q. Did you have any information from Mr. Porio about whether

9 15:40:21   or not he was diabetic?

10 15:40:23   A. Yes.

11 15:40:24   Q. Let's look at 83A-5.  And let's look at question number

12 15:40:34   7.

13 15:40:36         Did you ask question 7 of Mr. Porio?

14 15:40:38   A. Yes.

15 15:40:39   Q. Did you ask him whether or not he had diabetes?

16 15:40:43   A. Yes.

17 15:40:43   Q. What did he communicate to you?

18 15:40:45   A. None of these.

19 15:40:47   Q. So did you have any concerns on the date of the incident

20 15:40:50   that Mr. Porio fell into the risk group of diabetics for

21 15:40:56   stroke?

22 15:40:56   A. No.

23 15:40:58   Q. Can being overweight be a risk factor for stroke?

24 15:41:03   A. Yes.

25 15:41:04   Q. Did you have any information about whether or not

15:41:05  Mr. Porio was overweight when you were assessing his health?

15:41:08  A. Yes.

15:41:10  Q. Let's go to Exhibit 256, Officer Flores's arrest report.

15:41:18  Did Officer Flores, did he record any height and

15:41:22  weight for Mr. Porio?

15:41:23  A. Yes.

15:41:24  Q. Based on your training and experience, based on this

15:41:32  information that is entered, is Mr. Porio overweight?

15:41:35  A. No.

15:41:35  Q. Were you able to eyeball him when he was in front of you?

15:41:38  A. Yes.

15:41:38  Q. Did he look overweight?

15:41:40  A. No.

15:41:40  Q. So did you have any concerns when you were with Mr. Porio

15:41:44  that his weight put him in a risk group for stroke?

15:41:47  A. No, not at all.

15:41:48  Q. All right.  Use of illegal drugs can put you in a risk

15:41:56  group for stroke, true?

15:41:57  A. Yes.

15:41:57  Q. Did you ask Mr. Porio about that?

15:42:00  A. Yes, I did.

15:42:01  Q. All right.  Let's put up Exhibit 83A-12.

15:42:10  And did you ask Mr. Porio about whether he was using

15:42:16  cocaine?

15:42:17  A. Yes.

1 15:42:17   Q. Did you ask him if he was using methamphetamine?

2 15:42:21   A. Yes.

3 15:42:21   Q. Did he tell you anything about that?

4 15:42:25   A. Yes.  He said no.

5 15:42:27   Q. All right.  So did you have any concern when you were

6 15:42:31   with Mr. Porio that he fell into a risk group for stroke

7 15:42:36   because of illegal drug use?

8 15:42:37   A. No.

9 15:42:38   Q. Let's talk about Mr. Porio's age.  Can a patient's age

10 15:42:45   put a person at risk for stroke?

11 15:42:47   A. Yes.

12 15:42:48   Q. Why do you say that?

13 15:42:50   A. Usually the older population, 60 years and up, are more

14 15:42:55   prone to having strokes.

15 15:42:56   Q. Did you have any information about Mr. Porio's age when

16 15:42:59   you were assessing him?

17 15:43:00   A. Yes.

18 15:43:01   Q. All right.  Let's go back to 256 from Officer Flores.

19 15:43:08       Is Mr. Porio's date of birth recorded?

20 15:43:11   A. Yes.

21 15:43:11   Q. So back on the date of the incident, how old was

22 15:43:18   Mr. Porio?

23 15:43:18   A. It was in 2021, so he was 39.

24 15:43:21   Q. Does that put him in the risk group for stroke?

25 15:43:24   A. No.

1 15:43:26  Q. We've talked about risk groups.  Let's talk about
2 15:43:30  symptoms.
3 15:43:31          Why is it important to look for symptoms?
4 15:43:35  A. So we can, you know, evaluate and treat if necessary.
5 15:43:40  Q. Are there certain symptoms that are associated with
6 15:43:43  somebody that is actively suffering a stroke?
7 15:43:44  A. Yes.
8 15:43:45  Q. All right.  Can a severe headache be a symptom that
9 15:43:51  someone is having a stroke?
10 15:43:52  A. Yes.
11 15:43:53  Q. Did you have any information on whether or not Mr. Porio
12 15:43:57  had a severe headache when you were assessing him?
13 15:43:59  A. Yes.
14 15:44:00  Q. Let's take a look at the COVID screening form again.
15 15:44:05  This is from Officer Flores, Exhibit 257.
16 15:44:10          Was there any information on this form that helped
17 15:44:12  you assess whether or not Mr. Porio was complaining of a
18 15:44:15  severe headache?
19 15:44:16  A. Yes.
20 15:44:16  Q. What?
21 15:44:17  A. It says no, he does not have a headache.
22 15:44:21  Q. So did you just rely on what the officer recorded or did
23 15:44:25  you ask Mr. Porio whether he had a headache?
24 15:44:27  A. I asked him as well.
25 15:44:28  Q. All right.  Let's pull up your triage questionnaire,

1 15:44:32   which is Exhibit 83A-4.

2 15:44:35        I would like you to look at question 4.  And tell me

3 15:44:40   about the communication you had with Mr. Porio there.

4 15:44:42   A. "Do you have or are you experiencing," and I listed all

5 15:44:48   of those, and I said all of those, and he said no.

6 15:44:51   Q. Okay.  Is one of those headache?

7 15:44:53   A. Yes.

8 15:44:55   Q. So when you were with Mr. Porio, did you have any concern

9 15:44:59   that he had the headache symptom associated with stroke?

10 15:45:03  A. No.

11 15:45:05  Q. Can nausea be a symptom that someone is having a stroke?

12 15:45:10  A. Yes.

13 15:45:10  Q. Did you have any information on whether or not Mr. Porio

14 15:45:14  was nauseous when you were assessing him?

15 15:45:17  A. Yes.

16 15:45:18  Q. All right.  Let's pull up the COVID screening form again.

17 15:45:21  This is 257.

18 15:45:24        Was there any information on this form that helps

19 15:45:27  you assess whether or not Mr. Porio was complaining of

20 15:45:29  nausea?

21 15:45:29  A. Yes.

22 15:45:30  Q. What?

23 15:45:31  A. It's checkmarked "no" next to "nausea or vomiting."

24 15:45:36  Q. All right.  And based on your training and experience,

25 15:45:41  who would have made this checkmark?

1  15:45:42   A. The officer.

2  15:45:43   Q. And how would he have gathered this information?

3  15:45:45   A. He would have asked Mr. Porio.

4  15:45:47   Q. All right.  Let's pull up your triage questionnaire.

5  15:45:53   83A-4.  I would like you to look at question 4 again.

6  15:45:56        Did you do your own independent assessment as to

7  15:45:59   whether or not Mr. Porio was complaining of nausea?

8  15:46:04   A. Yes.

9  15:46:04   Q. What did he tell you?

10 15:46:05   A. No.

11 15:46:07   Q. Which letter is nausea?

12 15:46:09   A. Nausea is F, "vomiting and diarrhea".

13 15:46:21   Q. Based on your training and experience, based on what you

14 15:46:23   saw from Officer Flores and what you gathered from Mr. Porio,

15 15:46:27   did you have any concern that Mr. Porio was experiencing

16 15:46:32   nausea as a symptom of a stroke?

17 15:46:33   A. No.

18 15:46:35   Q. All right.  Can hallucinations be a symptom that someone

19 15:46:39   is having a stroke?

20 15:46:40   A. Yes.

21 15:46:40   Q. What is a hallucination?

22 15:46:44   A. Seeing things or hearing things that aren't there.

23 15:46:47   Q. Did you have any information on whether or not Mr. Porio

24 15:46:50   was experiencing hallucinations when you were assessing him?

25 15:46:53   A. Yes.

1   15:46:53   Q. All right.  Let's look at your triage questionnaire,

2   15:46:57   83A-4.  I would like you to look at question 4 again.

3   15:47:02          Did you inquire of Mr. Porio whether or not he was

4   15:47:05   experiencing hallucinations?

5   15:47:06   A. Yes.

6   15:47:07   Q. What did he tell you?

7   15:47:11   A. No.

8   15:47:12   Q. All right.  Let's look at a separate part of your triage

9   15:47:16   questionnaire, 83A-14.

10  15:47:26          Did Mr. Porio communicate anything to you on

11  15:47:29   question 14 about hearing voices or seeing things that others

12  15:47:34   do not see or hear?

13  15:47:35   A. Yes.

14  15:47:37   Q. What did he tell you?

15  15:47:38   A. He said no.

16  15:47:39   Q. So based on your training and experience, did Mr. Porio's

17  15:47:44   denials of having hallucinations suggest to you it was likely

18  15:47:49   he was having a stroke?

19  15:47:50   A. No.

20  15:47:51   Q. Let's talk about unconsciousness.  Based on your training

21  15:47:55   and experience, can unconsciousness be a symptom of stroke?

22  15:47:58   A. Yes.

23  15:47:59   Q. Did Mr. Porio ever go unconscious when you were with him?

24  15:48:03   A. No.

25  15:48:03   Q. Did you ask him about loss of consciousness covering the

1 15:48:07  time period before he saw you?

2 15:48:08   A. I did.  In fact, that is one of my first questions when

3 15:48:11  they come into the booth.  I always ask, in the last three

4 15:48:14  days, have you had a head injury or have you been knocked

5 15:48:20  unconscious.

6 15:48:20   Q. All right.  Let's look at 83A-10.

7 15:48:27         What did Mr. Porio tell you about fainting or having

8 15:48:31  a loss of consciousness in the past 72 hours?

9 15:48:33   A. No.

10 15:48:38   Q. Did you have any concern when you were with Mr. Porio

11 15:48:45  that he was either currently or had been experiencing a loss

12 15:48:49  of consciousness that is a symptom of stroke?

13 15:48:52   A. No.

14 15:48:54   Q. All right.  Let's talk about loss of movement on one side

15 15:48:59  of the body.  Can paralysis of one side of the body be a

16 15:49:04  symptom of stroke?

17 15:49:04   A. Yes.

18 15:49:05   Q. Did -- you saw Mr. Porio enter the triage booth, correct?

19 15:49:09   A. Yes.

20 15:49:10   Q. Was he walking at that time?

21 15:49:12   A. Yes.

22 15:49:12   Q. Were both knees bending when he walked or did one knee

23 15:49:18  appear paralyzed?

24 15:49:19   A. Both knees were bending.

25 15:49:21   Q. Let's play 109, clip 1.

1  15:49:24                (Thereupon, the video was played.)

2  15:49:29    Q. What do you see Mr. Porio's knees doing, both of them?

3  15:49:32    A. Both are bending as he's walking, and then they will bend

4  15:49:36    when he sits.

5  15:49:36    Q. All right.  So based on your training and experience, did

6  15:49:43    Mr. Porio's knee movement suggest to you that he was having a

7  15:49:46    stroke?

8  15:49:46    A. No.

9  15:49:49    Q. What is ptosis?

10 15:49:53    A. The drooping eyelid.

11 15:49:56    Q. How do you spell that?

12 15:49:57    A. P-T-O-S-I-S.

13 15:49:59    Q. All right.  Can one drooping eyelid be a symptom that

14 15:50:08    someone is having a stroke?

15 15:50:09    A. Yes.

16 15:50:10    Q. Did you have any information when you were assessing

17 15:50:14    Mr. Porio as to whether or not he had one drooping eyelid?

18 15:50:17    A. Yes.

19 15:50:17    Q. What did you have?

20 15:50:18    A. He did not have one drooping eyelid.

21 15:50:21    Q. All right.  And did he ever look right at you, so you

22 15:50:27    could see his eyes?

23 15:50:27    A. Yes.

24 15:50:28    Q. All right.  Let's look at Exhibit 109.  This is clip 2.

25 15:50:33                And for the record, this is 9:51 in the morning,

1 15:50:37 26 seconds, to 9 in the morning, 51 minutes and 34 seconds.

2 15:50:44           (Thereupon, the video was played.)

3 15:50:52 Q. Are you able to see his eyelids, ma'am?

4 15:50:56 A. Yes, where I'm sitting behind the window there, yes.

5 15:50:58 Q. All right.  That is a good point.

6 15:51:00           Okay.  Where are you in this tape?

7 15:51:07 A. I'm, yeah, pretty much right there, behind that window.

8 15:51:11 Q. Are you behind this glass here?

9 15:51:13 A. I am, yes.

10 15:51:14 Q. The glass is clear that you can see through?

11 15:51:16 A. Yes.

12 15:51:16 Q. All right.  So did you have any information in the

13 15:51:24 12 minutes you spent with Mr. Porio as to whether or not he

14 15:51:26 had one drooping eyelid?

15 15:51:28 A. Yes.

16 15:51:29 Q. What did you have?

17 15:51:30 A. He did not have one droopy eyelid.  He turned to face me,

18 15:51:34 so I had a straight on visual of him looking at me.

19 15:51:38 Q. Based on your training and experience with DUI arrestees,

20 15:51:47 is both eyelids drooping at the same level a medical

21 15:51:52 emergency?

22 15:51:53 A. No.

23 15:51:54 Q. Based on your training and experience, can both eyelids

24 15:51:57 drooping be a symptom of intoxication?

25 15:51:59 A. Yes.

1  15:52:00   Q. All right.  Now, you were asked about the COVID mask.

2  15:52:10   Can the entire one side of the face drooping, can that be a

3  15:52:14   symptom that someone is having a stroke?

4  15:52:16   A. Yes.

5  15:52:17   Q. Were you able to see Mr. Porio's entire face when you

6  15:52:20   were assessing him?

7  15:52:21   A. Not his entire face, just most of it, though, the mask

8  15:52:27   was covering part of his face.

9  15:52:29   Q. Why not lower his mask and look?

10 15:52:31   A. We were -- at that point we were in the height of COVID,

11 15:52:34   so it was against our policy to take off a mask unless there

12 15:52:37   was some kind of a compelling medical emergency.

13 15:52:41   Q. Did you have a compelling medical emergency here?

14 15:52:43   A. No.

15 15:52:44   Q. Why do you say that?

16 15:52:45   A. I didn't see any symptoms of a stroke.  I had no

17 15:52:50   knowledge of any risk factors for a stroke.  Didn't see a

18 15:52:53   drooping eyelid.  Didn't see any paralysis on one side of his

19 15:52:57   body.  Both knees were bending as he sat down.  He turned in

20 15:53:03   his seat, which is difficult to do when you are handcuffed,

21 15:53:09   especially when wearing flip flops.  He even turned to face

22 15:53:12   me and look at me, and I did not see any symptoms of a

23 15:53:15   stroke.

24 15:53:15   Q. So it is jail policy in those circumstances to lower the

25 15:53:18   mask?

1  15:53:19    A. No.

2  15:53:19    Q. Did you make that policy?

3  15:53:21    A. No, that is the medical supervisor's.

4  15:53:24    Q. Why not just lower the mask?

5  15:53:25    A. I didn't want to get in trouble, for one.  I didn't want

6  15:53:29    to be exposed to COVID --

7  15:53:30    Q. All right.

8  15:53:31    A. -- was another.

9  15:53:32    Q. Drooping arms.  As part of one side of the body being

10 15:53:37    paralyzed, can one arm droop?

11 15:53:40    A. Yes.

12 15:53:40    Q. Here you've already told us Mr. Porio -- we see on the

13 15:53:47    film Mr. Porio was handcuffed when you saw him, right?

14 15:53:49    A. Yes.

15 15:53:49    Q. Why not get the handcuffs off and see if he could raise

16 15:53:52    his arm?

17 15:53:53    A. Well, jail is a high security facility, so everyone

18 15:53:57    remains handcuffed when they come into the triage booth for

19 15:54:00    safety reasons, for everybody.  And they don't get

20 15:54:04    unhandcuffed until they go inside the location and the

21 15:54:06    deputies professionally do their professional search and make

22 15:54:09    sure there is no weapons and then unhandcuff them.

23 15:54:12    Q. Okay.  So the "professional search," is that before or

24 15:54:18    after you saw Mr. Porio?

25 15:54:20    A. That is after.

15:54:21  1  Q. Okay.  So are you ever allowed to remove the handcuffs?

15:54:29  2  A. No.

15:54:30  3  Q. All right.

15:54:31  4  A. Unless there is some major, you know, medical compelling

15:54:35  5  emergency.

15:54:37  6  Q. Did you feel that you had that?

15:54:38  7  A. No.

15:54:39  8  Q. Why do you say that?

15:54:40  9  A. I didn't see any symptoms of a stroke, I had no knowledge

15:54:45  10  of any risk factors for a stroke, I didn't see any compelling

15:54:49  11  medical emergency to do that.

15:54:50  12  Q. All right.  So let's wrap up on stroke.

15:54:55  13         Did the information that you had regarding

15:55:01  14  Mr. Porio's blood pressure, his lack of head trauma, his lack

15:55:05  15  of diabetes, his normal weight, his no drug history, and

15:55:10  16  young age suggest to you that there was a high degree of risk

15:55:15  17  he would suffer from a stroke if he did not receive a

15:55:18  18  doctor's care?

15:55:19  19  A. No.

15:55:24  20  Q. Let's wrap up on symptoms.  Did the information that you

15:55:30  21  had regarding Mr. Porio's lack of headache, lack of nausea,

15:55:36  22  lack of drooping eyelid, lack of paralysis in one knee, lack

15:55:41  23  of hallucinations, and lack of unconsciousness suggest to you

15:55:47  24  that there was a high degree of risk he would suffer from a

15:55:50  25  stroke if he did not receive a doctor's care?

1  15:55:52    A. No.

2  15:55:55    Q. Did you believe that you gave Mr. Porio a fair

3  15:56:00    opportunity to tell you whether he fell into a risk group for

4  15:56:05    stroke?

5  15:56:05    A. Yes.

6  15:56:06    Q. Do you believe that you gave Mr. Porio a fair opportunity

7  15:56:10    to tell you whether he was suffering any symptoms from a

8  15:56:13    stroke?

9  15:56:13    A. Yes.

10 15:56:14    Q. Did you ever just flat out ask Mr. Porio if he was

11 15:56:19    suffering from a stroke?

12 15:56:20    A. It's one of the questions.

13 15:56:23    Q. Let's take a look at a form.  Let's put up 83A-7.

14 15:56:34        "Have you had or do you currently have any of the

15 15:56:37    following medical conditions, problems."  Right?

16 15:56:39    A. Correct.

17 15:56:41    Q. Is this the one for stroke?

18 15:56:50    A. Yes.  On the middle row down below hypertension it says

19 15:56:54    TIA or stroke.

20 15:56:56    Q. Where does it say "TIA"?

21 15:56:59    A. Just before stroke.

22 15:57:00    Q. Did you go through this list with Mr. Porio?

23 15:57:02    A. I did.

24 15:57:03    Q. Did he tell you that he had a stroke?

25 15:57:05    A. No.

1 15:57:07  Q. All right.  Why not send Mr. Porio to a doctor anyway?

2 15:57:12  A. For intoxication, we don't normally do that unless he's

3 15:57:18  passing out or going into seizures.

4 15:57:20  Q. Would that cause any problems at the jail if you sent

5 15:57:26  someone that was simply intoxicated to a doctor?

6 15:57:29  A. Oh, yeah.  We are limited on our providers, we might have

7 15:57:33  one or two on duty, and there is a lot of inmates in the loop

8 15:57:36  area, 100 to 200 that might need more medical attention or

9 15:57:40  quicker medical attention.  If I pulled a provider up to

10 15:57:43  triage, it wouldn't be fair to the other inmates that

11 15:57:46  actually need serious medical attention.

12 15:57:48  Q. Let's talk about intoxication.

13 15:57:51       Did you have any information that Mr. Porio was

14 15:57:54  under the influence of alcohol when you saw him?

15 15:57:56  A. Yes.

16 15:57:57  Q. Let's look at Officer Flores's Prebooking Record.  This

17 15:58:02  is Exhibit 256.

18 15:58:09       Did you note any charges for Mr. Porio as a reason

19 15:58:12  for why he was brought to the jail in the first place?

20 15:58:14  A. Yes.

21 15:58:15  Q. What was the charge?

22 15:58:17  A. 23152(a) of the California Vehicle Code.

23 15:58:22  Q. And straight up layman's terms, what does that mean?

24 15:58:26  A. DUI.

25 15:58:27  Q. All right.  How do you know that?

1  15:58:30  A. From my years of dispatching, I got to learn some of the

2  15:58:35  vehicle codes and some of the charges.

3  15:58:37  Q. Now, when you saw that Mr. Porio was charged with driving

4  15:58:42  under the influence, was that relevant to you --

5  15:58:45  A. Yes.

6  15:58:45  Q. -- when you were assessing Mr. Porio?

7  15:58:48  A. Yes.

8  15:58:48  Q. Why?

9  15:58:48  A. Officers are trained, they have specialized training in

10 15:58:53  finding drunk drivers or spotting, you know, people that are

11 15:58:56  driving under the influence.  And they have more training as

12 15:58:59  far as field sobriety tests once they are investigating this

13 15:59:03  person who is driving under the influence.

14 15:59:05          Officers also have to have probable cause to bring

15 15:59:08  them to the jail for driving under the influence.

16 15:59:12  Q. Okay.  So did you just rely on Officer Flores's report of

17 15:59:22  what he saw and what he experienced or did you do your own

18 15:59:26  investigation?

19 15:59:26  A. I did both.  I looked at the paperwork, and then I did my

20 15:59:31  own investigation, so to speak, by asking Mr. Porio all these

21 15:59:34  questions, as well.

22 15:59:35  Q. All right.  Can unsteadiness on your feet be a symptom of

23 15:59:41  intoxication?

24 15:59:42  A. Yes.

25 15:59:42  Q. Did you observe that with Mr. Porio?

1 15:59:44   A. A little bit.

2 15:59:45   Q. Can the failure to clearly communicate, can that be a

3 15:59:49   symptom of intoxication?

4 15:59:50   A. Yes.

5 15:59:50   Q. Did you observe that with Mr. Porio?

6 15:59:52   A. Yeah, yes.

7 15:59:53   Q. Why didn't this information cause you to conclude he was

8 15:59:58   suffering from a stroke?

9 15:59:58   A. It didn't cause me to conclude.

10 16:00:02   Q. Why -- why didn't you conclude he was suffering from a

11 16:00:07   stroke when he was unsteady on his feet and was not clear in

12 16:00:10   his communication?

13 16:00:11   A. He didn't have any, like a droop -- one eyelid wasn't

14 16:00:15   drooping, he wasn't -- I didn't see any paralysis on one

15 16:00:21   side, both knees were bending when he sat down.  No risk

16 16:00:24   factors.  I had no knowledge of any risk factors or no

17 16:00:27   knowledge of any stroke symptoms at that time.

18 16:00:29        THE COURT:  I'm going to interrupt you at this time.

19 16:00:32   It's 4:00, so we are going to be dismissing you at this time.

20 16:00:35        Again, remember the admonishment not to discuss the

21 16:00:38   case among yourselves or with anyone else, or form or express

22 16:00:41   any opinion about the matter until you retire to the jury

23 16:00:43   room.

24 16:00:44        What I'm telling you is, when you go home tonight,

25 16:00:47   don't think about this case.  There has got to be something