# EXHIBIT C

```
08:32:43   1                    UNITED STATES DISTRICT COURT

           2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

           3             R. GARY KLAUSNER, JR., U.S. DISTRICT JUDGE

           4

           5
               SHAWN PORIO,                 )
           6                                )
                         Plaintiff,         )
           7                                )
                         vs.                )
           8                                )   8:22-CV-812-RGK
               YVETTE BARBARI,              )
           9                                )
                         Defendant.         )
          10   _____)
                                            )
          11                                )
                                            )
          12

          13

          14

          15            REPORTER'S TRANSCRIPT OF JURY TRIAL

          16                         VOLUME II

          17                   Los Angeles, California

          18                Wednesday, December 11, 2024

          19

          20
                         _____
          21
                              AMY DIAZ, RPR, CRR, FCRR
          22                    Federal Official Reporter
                              350 West 1st Street, #4455
          23                     Los Angeles, CA 90012

          24

          25      Please order court transcripts here:  www.amydiazfedreporter.com
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1    APPEARANCES OF COUNSEL:
 2
      For the Plaintiff:
 3

 4              THE LAW OFFICES OF JOHN BARTON
                By:  John Barton, Attorney at Law
 5              128 North Fair Oaks Avenue
                Pasadena, California 91103
 6

 7              LAW OFFICE OF JOHN FATTAHI
                By:  John Fattahi, Attorney at Law
 8              21250 Hawthorne Boulevard, Suite 500
                Torrance, California 90503
 9

10
      For the Defendant:
11
                LYNBERG & WATKINS APC
12              By:  S. Frank Harrell, Attorney at Law
                     G. Craig Smith, Attorney at Law
13              1100 West Town and Country Road, Suite 1450
                Orange, California 92868
14

15

16

17

18

19

20

21

22

23

24

25
```

```
09:08:51   1              THE COURT:  Yes.
09:08:51   2       Q.     "QUESTION:  Did you ask him what time it was?
09:08:56   3              ANSWER:  I don't recall."
09:09:10   4              MR. BURTON:  Thank you, Your Honor.
09:09:11   5              THE COURT:  Thank you, Counsel.
09:09:12   6              Recross?
09:09:14   7              MR. HARRELL:  None, Your Honor.  Thank you.
09:09:15   8              THE COURT:  You may step down.  Thank you very much.
09:09:17   9              THE WITNESS:  Thank you.
09:09:19  10              THE COURT:  Okay.  Next witness.
09:09:22  11              MR. FATTAHI:  Your Honor, plaintiff would call
09:09:34  12       Dr. Homer Venters.
09:09:46  13              THE CLERK:  Stand there to be sworn in.
09:09:48  14              Raise your right hand.
09:09:48  15       THEREUPON:
09:09:48  16                             HOMER VENTERS,
09:09:48  17       called in these proceedings and being first duly sworn
09:09:48  18       testifies as follows:
09:09:57  19              THE CLERK:  Thank you.  Please be seated.
09:10:04  20              Please adjust the microphone so that you are
09:10:07  21       speaking into it at all times.
09:10:08  22              For the record, please state your full name and
09:10:12  23       spell your last name.
09:10:13  24              THE WITNESS:  Homer Drey Venters, V-E-N-T-E-R-S.
09:10:20  25              THE COURT:  Thank you, Doctor.
```

```
 1 10:58:51    Mr. Porio being unable to raise one of his arms, right?
 2 10:58:54     A. Again, it sounds like you are asking the same question
 3 10:58:59    twice.  But, yes, if he doesn't have unilateral weakness,
 4 10:59:05    then I don't believe he would be unable to raise his arm.
 5 10:59:09     Q. And that is a point that was not included in the opinion
 6 10:59:14    section of your Rule 26 report, right?
 7 10:59:17     A. Correct.
 8 10:59:20     Q. All right.  So let's wrap up on stroke here.
 9 10:59:26              Assuming Nurse Barbari accurately recorded what she
10 10:59:31    learned, would the information that Nurse Barbari had
11 10:59:35    regarding Mr. Porio's blood pressure, lack of head trauma,
12 10:59:41    lack of diabetes, normal weight, no drug use history, and
13 10:59:47    young age suggest to a reasonably well-trained nurse that
14 10:59:51    there was a high degree of risk he would suffer from a stroke
15 10:59:55    if he did not receive a doctor's care?
16 10:59:58     A. If that is the only information she had, then no, I don't
17 11:00:03    believe so.
18 11:00:03     Q. All right.  Let's wrap up with symptoms.
19 11:00:09              Assuming she accurately recorded what she learned,
20 11:00:14    would the information Nurse Barbari had regarding Mr. Porio's
21 11:00:20    lack of a headache, lack of nausea, lack of one drooping
22 11:00:26    eyelid, lack of paralysis in one knee, lack of
23 11:00:32    hallucinations, and lack of unconsciousness suggest to a
24 11:00:35    reasonably well-trained nurse that there was a high degree of
25 11:00:40    risk he would suffer from a stroke if he did not receive a
```

```
11:00:43   doctor's care?
11:00:45     A. Again, if that is all the information she had, I would
11:00:48   say no.
11:00:49     Q. Did you see in the materials where Nurse Barbari says she
11:00:53   flat out asked Mr. Porio, Are you suffering from a stroke?
11:00:59     A. I don't recall that.  I'm not disputing it, I just don't
11:01:03   recall.
11:01:04     Q. All right.  Let's put up Exhibit 83A-7.
11:01:13           Sir, right here -- can I have that pointer?
11:01:25           All right, sir, I think I'm pointing to the right
11:01:28   one.  Can you see on your screen where you are that there is
11:01:31   a question there on Nurse Barbari's intake form about stroke?
11:01:35     A. Yes.
11:01:36     Q. Okay.  Do you recall what the answer was?
11:01:39     A. I see that the answer is checked as none for all of those
11:01:44   things.
11:01:45     Q. Right.
11:01:49           So let's talk about being under the influence of
11:01:52   alcohol.
11:01:55           Based on your review of the materials, did Nurse
11:02:02   Barbari have any information that Mr. Porio was under the
11:02:04   influence of alcohol when she saw him?
11:02:08     A. She -- my understanding is she reviewed some law
11:02:13   enforcement forms, and then she also documented that he
11:02:17   reported using alcohol.  Those are the two sources of
```

```
11:03:45   1          When you were supervising in New York City, every
11:03:50   2   arrestee went to a doctor, right?
11:03:52   3    A. After they saw a nurse, yes.
11:03:54   4    Q. Right.
11:03:56   5          You understand that that is not how it's done in
11:03:59   6   California, correct?
11:04:00   7    A. Yes, that is how it's done most places I work.
11:04:03   8    Q. Are you advocating here for our jails to be like the
11:04:07   9   jails in New York City?
11:04:08  10    A. No, I'm saying most of the jails I work in as a monitor
11:04:13  11   are just like Orange County, a nurse does a receiving
11:04:16  12   screening and then if there are red flags, they will expedite
11:04:19  13   to a doctor.
11:04:19  14    Q. New York City is in the minority of sending every
11:04:24  15   arrestee to a doctor, right?
11:04:25  16    A. I --
11:04:28  17    Q. Fair to say?
11:04:28  18    A. I don't know.  I think most of the big facilities I've
11:04:32  19   seen, Los Angeles, Cook County, King County in Seattle -- but
11:04:37  20   if you added up all 3,000 county jails, I would say less than
11:04:42  21   half of them do that.
11:04:44  22    Q. So let's get back to Nurse Barbari and what she says that
11:04:49  23   she saw.
11:04:52  24          Unsteadiness on your feet can be a symptom of
11:04:54  25   intoxication, right?
```

```
11:04:56   1    A. Yes.
11:04:56   2    Q. Based on your review of the materials, if Nurse Barbari
11:05:02   3    was attentive, would she have observed Mr. Porio being
11:05:08   4    unsteady on his feet?
11:05:10   5    A. I recall that as her testimony this morning, that she
11:05:14   6    observed that.
11:05:14   7    Q. Well, you yourself have looked at the triage video,
11:05:17   8    right?
11:05:17   9    A. Yes.
11:05:18  10    Q. Mr. Porio was unsteady on his feet, true?
11:05:21  11            THE COURT:  Counsel, again, that is for the jury to
11:05:23  12    determine.  His evaluation of the video is not relevant.
11:05:28  13    Q. Sir, let's play the triage tape.  This is Exhibit 109,
11:05:40  14    clip number 1.
11:05:42  15            (Thereupon, the video was played.)
11:05:55  16    Q. Could a reasonably well-trained nurse conclude that the
11:06:01  17    manner of Mr. Porio walking is consistent with intoxication?
11:06:10  18    Yes, no, or I don't know.
11:06:11  19    A. I'm -- I don't believe a nurse can make an assessment of
11:06:16  20    what the medical problem is.
11:06:18  21    Q. All right, sir, let's ask it another way.
11:06:21  22            Assume you are not a nurse, all right?  Assume they
11:06:24  23    are just somebody walking around in public that doesn't know
11:06:27  24    anything about medicine.  Can you do that?
11:06:30  25    A. Sure.
```

```
11:06:31   1   Q.  Could a reasonably well-informed person living life
11:06:39   2   reasonably conclude that Mr. Porio's manner of walking here
11:06:43   3   is consistent with intoxication?
11:06:45   4   A.  That could be one of the things it's consistent with,
11:06:49   5   yes.
11:06:49   6   Q.  Now we move on.
11:06:50   7           Can the failure to communicate clearly be a symptom
11:06:53   8   of intoxication?
11:06:55   9   A.  It could be.
11:06:56  10   Q.  All right.  In your review of the materials, did you see
11:07:02  11   that Nurse Barbari said she observed that with Mr. Porio?
11:07:06  12   A.  Yes.
11:07:07  13   Q.  All right.  Assuming that Nurse Barbari accurately
11:07:15  14   recorded her communications, would Mr. Porio's lack of
11:07:34  15   speaking clearly, would that suggest to a reasonably
11:07:37  16   well-trained nurse that this could be a symptom of
11:07:41  17   intoxication?
11:07:43  18   A.  I -- I think it would indicate to a reasonably
11:07:47  19   well-trained nurse that he's not speaking properly, and
11:07:52  20   somebody who has the training to figure out what the problem
11:07:54  21   is has to see him and figure it out.
11:07:57  22   Q.  And again, that is the way you do it in New York City,
11:08:01  23   correct?
11:08:01  24   A.  No, that is the way -- that is the way receiving
11:08:05  25   screening when a nurse -- the whole reason for the receiving
```

```
11:09:31   City, where every single arrestee sees a doctor, right?
11:09:35     A. After they had the same receiving screening.
11:09:38     Q. Right.  Let's talk about what is medically advisable,
11:09:45   setting aside how they do it in New York, okay?  Can you do
11:09:48   that?
11:09:49     A. Yes.  My opinions here are not solely based on my
11:09:52   experience there.
11:09:53     Q. I understand.
11:09:54            Based on your training and experience, is it always
11:09:59   medically advisable for a person who is under the influence
11:10:03   of alcohol to go see a doctor for treatment?  Yes, no, or I
11:10:08   don't know.
11:10:08     A. Do you mean in a jail setting or --
11:10:12     Q. No.  So I ask it again:  Based on your training and
11:10:17   experience, is it always medically advisable for a person who
11:10:23   is under the influence of alcohol to go see a doctor for
11:10:27   treatment?  Yes, no, or I don't know.
11:10:30     A. No.
11:10:31     Q. Based on your training and experience, is it ever
11:10:37   medically appropriate for a person who is under the influence
11:10:41   of alcohol in public to just get a ride home and sleep it
11:10:45   off?
11:10:47            THE COURT:  Counsel, that is more of an
11:10:49   argumentative question.  That is not the facts in this case.
11:10:51   So why don't you ask your next question.
```